Evelyn V. Keyes, Justice
In this medical malpractice case, appellee, Barry Clayton Lancaster, as an heir of Barry Lancaster, brought survival and wrongful death causes of action against appellant, Bay Oaks SNF, LLC d/b/a The Lakes at Texas City and d/b/a Bay Oaks Health Care Center ("Bay Oaks"), after his father developed pressure ulcers while residing at Bay Oaks. Lancaster filed an amended expert report pursuant to Civil Practice and Remedies Code Section 74.351. Bay Oaks objected to the expert report and moved to dismiss Lancaster's suit. The trial court denied Bay Oaks' motion to dismiss.
In two issues, Bay Oaks challenges the trial court's order denying its motion to dismiss. In its first issue, Bay Oaks contends that because the expert report does not address Lancaster's wrongful death cause of action, the trial court erred by denying its motion to dismiss that claim. In its second issue, Bay Oaks contends that the expert report contained a conclusory and speculative opinion on the standard of care, and therefore the trial court erred by denying its motion to dismiss Lancaster's survival cause of action.
We affirm.
Background
Barry Lancaster was seventy-seven years old when he was admitted to Bay Oaks in May 2015. Lancaster was in poor health at the time of his admission, and he required "total" assistance "for all activities of daily living." At the time he was admitted to Bay Oaks, his skin was intact; however, over the course of the next several months, he developed pressure ulcers on several areas of his body, including his heel and his lower back, or sacrum. On August 29, 2015, Lancaster was transferred to the hospital, where he was diagnosed with pneumonia. While he was at the hospital, medical personnel treated Lancaster for multiple pressure ulcers, and his treatments included antibiotics for an infected pressure ulcer and "numerous debridements." Ultimately, Lancaster passed away on October 3, 2015, from aspiration pneumonia.
Lancaster's son, Barry Clayton Lancaster, filed suit against Bay Oaks. Lancaster alleged that Bay Oaks violated the standard of care by failing to prevent his father's "intact skin from deteriorating into a Stage 4 pressure ulcer." Lancaster alleged that his father's poor health did not make the development of pressure ulcers unavoidable and that any ulcers that developed could have been healed with proper treatment. Lancaster alleged that, as a result of Bay Oaks' negligence, his father "developed aspiration pneumonia, sepsis, dehydration, malnutrition, and multiple severe *272 pressure ulcers, all of which he ultimately could not recover from, leading to his death due to aspiration pneumonia." Lancaster asserted both survival and wrongful death claims against Bay Oaks.
Lancaster timely filed the expert report of Dr. Christopher Davey pursuant to Civil Practice and Remedies Code section 74.351. See TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017) (requiring, in health care liability claims, that claimants serve expert report on defendant health care providers within 120 days of defendant's original answer). After Bay Oaks objected to the sufficiency of Dr. Davey's expert report, Lancaster filed an amended report.
Dr. Davey began the amended expert report with a summary of his conclusions:
Mr. Lancaster was admitted to [Bay Oaks] with intact skin on his sacrum. The standard of care requires facilities like Bay Oaks and its nurses to prevent pressure ulcers from developing and to promote the healing of any pressure ulcers that do develop. The staff at Bay Oaks breached the standard of care by allowing Mr. Lancaster to develop multiple pressure ulcers, and allowing his sacral pressure ulcer to progress to an infected Stage IV ulcer. Specifically, the staff at Bay Oaks failed to implement adequate interventions to offload sustained pressure on Mr. Lancaster's sacrum for extended periods of time. The sustained pressure caused Mr. Lancaster's soft tissues to become distorted and die, which caused the Stage IV pressure ulcer. Mr. Lancaster suffered harm as a result of the pressure ulcer, including the need for aggressive wound care therapy and treatments, multiple surgical debridements, painful dressing changes, wound VAC placement, and IV antibiotics.
Dr. Davey set out his qualifications and stated that, in forming his opinions, he had reviewed Lancaster's medical records from Bay Oaks, as well as Lancaster's records from three hospitals.
The amended report stated that Lancaster was re-admitted to Bay Oaks in May 2015, and that he had a history of a stroke, diabetes, pneumonia, dysphagia, hypertension, heart disease, and incontinence. The medical records reflected that Lancaster had intact skin when he was admitted to Bay Oaks, and medical personnel determined that he was "only a mild risk for developing pressure ulcers." Medical records from July 2015 reflected that Lancaster had a wound on his right knee that was resolved later that month and a Stage IV pressure ulcer on his left heel. Medical personnel noted that Lancaster developed a Stage II pressure ulcer on his right buttock at the end of July 2015 and a Stage II ulcer on his left ischium in early August. Lancaster was admitted to the hospital on August 4, 2015, and was diagnosed with sepsis and aspiration pneumonia. While at the hospital, he received treatment for his pressure ulcers, including antibiotics, use of an air mattress, frequent turning and repositioning, and application of cream to his sacrum. Lancaster was re-admitted to Bay Oaks on August 17, 2015.
The day after he was re-admitted to Bay Oaks, medical personnel noted that Lancaster had an unstageable pressure ulcer on his left ischium, a Stage II pressure ulcer on his left buttock, and unstageable wounds to his sacrum. Doctors ordered daily wound care and use of an air mattress, which was not provided until August 20. Lancaster was again admitted to the hospital on August 29, 2015, and he was diagnosed with aspiration pneumonia, malnutrition, multiple pressure ulcers, and congestive heart failure. The pressure ulcers *273 on Lancaster's sacrum were unstageable and infected, he had a Stage III ulcer on his left shoulder and a Stage II ulcer on his coccyx, and all of these ulcers caused him pain. While he was in the hospital, he received multiple debridements for the pressure ulcers, as well as wound VAC therapy and antibiotic therapy. Lancaster passed away on October 3, 2015, with his cause of death listed as aspiration pneumonia and acute kidney injury.
With respect to the applicable standard of care, the amended expert report stated that long-term care facilities are required to abide by numerous regulations under Medicare and Medicaid, including a regulation providing that facilities and nurses should ensure that a resident who is admitted without pressure ulcers does not develop such ulcers "unless the individual's clinical condition demonstrates that the sores were unavoidable" and that a resident who develops pressure ulcers"receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing." Dr. Davey then described the standard of care specifically aimed at preventing the development of pressure ulcers, stating that the standard of care "requires that a patient be turned, provided with pressure relieving devices, be kept clean and dry, and be kept properly nourished" and that "a patient receive frequent head-to-toe body examinations to look for early signs of skin problems." Dr. Davey also set out guidelines produced by the National Pressure Ulcer Advisory Panel, which identified eight specific things health care providers should address when caring for patients at risk of developing pressure ulcers, including risk assessments, skin assessments and care, ensuring adequate nutrition, repositioning, the use of special mattresses for high-risk patients, and the use of support surfaces such as wheelchair cushions. Dr. Davey stated that the failure to do any of these things constitutes a breach of the standard of care.
Dr. Davey also opined that the standard of care requires that a patient who develops pressure ulcers receive the necessary treatment to "promote healing and prevent infection." He stated that the standard of care "requires that a patient be positioned so that pressure on the ulcer is relieved, the patient is kept clean and dry, and the patient is provided with adequate nutrition to support healing," and he also stated that "[a]ppropriate dressing and treatments should be used, or the ulcer is unlikely to heal, as was the case here." Dr. Davey further opined that the standard of care requires facilities such as Bay Oaks to have sufficient staffing levels such that the staff are able to "properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight" to ensure that "optimal nursing interventions" are implemented.
Dr. Davey then opined that Bay Oaks breached the standard of care by failing to prevent pressure ulcers from developing, failing to properly treat Lancaster's pressure ulcers once they developed, and failing to implement Texas Administrative Code requirements for nursing facilities. Specifically, the medical records reflected that Bay Oaks staff only completed one risk assessment, which indicated that Lancaster was a mild risk for developing pressure ulcers, but in Dr. Davey's opinion, Lancaster was a high risk for the development of pressure ulcers due to his "history of generalized muscle wasting, poor functional mobility, and generalized weakness, which would have severely limited him from freely repositioning himself." Dr. Davey opined that Bay Oaks should have implemented more aggressive interventions earlier in Lancaster's residency, *274 such as "proper assessments, pressure ulcer prevention, frequent repositioning, the application of a pressure-relieving mattress early in [Lancaster's] residency, and the use of a pressure reducing device in [Lancaster's] wheelchair." He stated that the medical records did not indicate that Bay Oaks staff turned and repositioned Lancaster every two hours, nor did the records indicate "that any special devices designed to offload pressure from Mr. Lancaster's sacrum were actually implemented until after he had already developed multiple unstageable pressure ulcers."
Dr. Davey also opined that Bay Oaks breached the standard of care by failing to perform consistent skin assessments. He stated that medical records contained no measurements or detailed descriptions about the ulcers that did form, nor did the records contain documentation that the ulcers "were ever continuously measured or assessed." Dr. Davey opined that it was "clear" that Bay Oaks' staff "was not properly assessing the pressure ulcer for signs of an early infection, such as foul odor or necrotic tissue," and that the failure of Bay Oaks to assess the pressure ulcers"before they progressed to unstageable and Stage III, with possible infection, and allowing the pressure ulcers to deteriorate" constituted a breach of the standard of care. Dr. Davey further opined that, because Lancaster was incontinent, Bay Oaks staff should have provided incontinence care every two hours, which would have given nurses the opportunity to assess the skin in Lancaster's sacral area. The medical records, however, did not indicate that this care was provided, which breached the standard of care.
Dr. Davey additionally opined that Bay Oaks breached the standard of care by failing to "promote the healing" of Lancaster's multiple pressure ulcers. Dr. Davey stated that it was clear that Bay Oaks did not implement appropriate measures to prevent and to promote healing of the pressure ulcers, as demonstrated by the fact that Lancaster "developed multiple, severe pressure ulcers while at the facility, one of which deteriorated until it was an infected Stage IV pressure ulcer." The medical records did not provide descriptions or measurements of Lancaster's wounds, "making it impossible to track any deterioration or attempt to adjust the treatments accordingly." Dr. Davey opined that Bay Oaks failed to implement a care plan to address Lancaster's pressure ulcers, which meant that "interventions could not be put in place or be updated or tailored to Mr. Lancaster's needs, as they should have been in order to prevent further deterioration of Mr. Lancaster's severe pressure ulcers."
Dr. Davey also stated that the medical records contained inconsistent information about what interventions were supposed to be in place and whether those interventions were actually implemented, including a lack of documentation of whether Bay Oaks staff turned and repositioned Lancaster every two hours[1] or whether staff actually used a pressure-reducing mattress that Lancaster's doctor had ordered. Dr. Davey concluded that because Lancaster did not receive the recommended interventions, the pressure ulcer on his sacrum did not heal; instead, "the ulcer deteriorated into Stage IV and increased in size substantially and eventually became infected, necessitating aggressive wound care therapy *275 and treatments, multiple surgical debridements, wound VAC placement, and IV antibiotics."
Dr. Davey's amended expert report also contained a section explaining how, to a reasonable degree of medical probability, Bay Oaks' breaches of the standard of care proximately caused injuries to Lancaster, including the development of a Stage IV pressure ulcer on his sacrum. Dr. Davey first set out general information concerning pressure ulcers, what causes them to develop on the body, the various stages of classification of pressure ulcers, and the impact of pressure ulcers on patients. Dr. Davey opined that when a facility fails to enact appropriate interventions to prevent the development of pressure ulcers, the patient "is more likely than not going to develop ulcers," and the standard of care at that point shifts "from prevention to treatment."
Dr. Davey included the following conclusions about how Bay Oaks' breaches of the standard of care caused injury to Lancaster:
[T]he staff at Bay Oaks failed to implement measures to ensure that Mr. Lancaster did not develop a sacral pressure ulcer and failed to promote the healing of his sacral ulcer once it developed. The staff failed to prevent the worsening of the ulcer, as it increased significantly in size, progressed to Stage IV, ultimately becoming infected and necessitating numerous debridements, wound VAC placement, and IV antibiotic therapy.
The staff also failed to properly assess Mr. Lancaster's skin throughout his residency at Bay [O]aks. While a Stage II sacral pressure [ulcer] was noted on 7/31/2015 by the nursing staff, no detailed assessments were done by any nurses from then until his transfer to the emergency department on 8/29/2015, by which time the ulcer had significantly deteriorated. This means that the staff was not preventing the pressure ulcer and not treating the pressure ulcer early to ensure the best outcome. The nurses' failure to assess, document, and communicate regarding Mr. Lancaster's pressure ulcer prevented the early assessments and treatments necessary to prevent his ulcer from both occurring and worsening.
Furthermore, the staff at Bay Oaks failed to ensure that Mr. Lancaster was properly nourished. Proper nutrition, including adequate protein, vitamin, and carbohydrate intake is vital to tissue healing. Since Mr. Lancaster was not receiving adequate nutrition, he was more vulnerable to skin breakdown. Most significantly, the staff at Bay Oaks failed to turn and reposition Mr. Lancaster frequently enough to offload pressure and provide him with an air mattress. Because the staff did not turn and reposition Mr. Lancaster regularly and provide him with an air mattress, Mr. Lancaster suffered from sustained pressure on his shoulder, ischium, and sacral regions. This sustained pressure caused the blood to stop flowing to these areas. Due to the lack of blood flow, the underlying tissue died which caused Mr. Lancaster to develop multiple pressure ulcers, including a sacral ulcer that eventually deteriorated into an infected Stage IV ulcer during his residency at Bay [O]aks.
....
In my opinion, Mr. Lancaster's severe ulcers were a proximate cause of harm. Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, and discomfort and difficulties with mobility. As a result of his pressure ulcer, Mr. Lancaster had continued *276 wound treatments that included multiple surgical debridements and wound VAC placement. These invasive treatments are not only uncomfortable, but can be very painful as well. Based on the records, I am also able to opine that Mr. Lancaster's multiple pressure ulcers, including his infected Stage IV sacral pressure ulcer proximately caused him significant pain.
Bay Oaks objected to Dr. Davey's amended expert report on the basis that Dr. Davey's opinion regarding breach of the standard of care was conclusory, arguing that Dr. Davey essentially opined that a breach of the standard of care existed simply because Lancaster developed pressure ulcers while at Bay Oaks, imposing a strict liability standard on Bay Oaks. Further, Bay Oaks argued that the amended report was insufficient because Dr. Davey did not opine at all about how the pressure ulcers may have contributed to Lancaster's death, and therefore the amended report provided no basis for the trial court to conclude that Lancaster's wrongful death claim had merit. Bay Oaks subsequently moved to dismiss Lancaster's suit due to the insufficient expert report.
After a hearing, the trial court denied Bay Oaks' motion to dismiss. This interlocutory appeal followed. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2017) (allowing interlocutory appeal from order that denies all or part of relief sought by motion under section 74.351(b) ).
Sufficiency of Expert Report
In two issues, Bay Oaks challenges the sufficiency of Dr. Davey's amended expert report. Specifically, in its first issue, Bay Oaks argues that the expert report does not address Lancaster's wrongful death cause of action. In its second issue, Bay Oaks argues that Dr. Davey rendered a conclusory and speculative opinion on the proper standard of care relevant to Lancaster's survival cause of action.
A. Standard of Review and Governing Law
Civil Practice and Remedies Code section 74.351(a) provides that in a health care liability claim, a claimant shall, not later than the 120th date after the defendant health care provider files its original answer, serve on that party one or more expert reports. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). Chapter 74 defines "health care liability claim" as
a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.
Id. § 74.001(a)(13) (West 2017). Section 74.351(r)(6) defines "expert report" as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Id. § 74.351(r)(6). The defendant health care provider may move to dismiss the claim with prejudice if an expert report has not been timely served. Id. § 74.351(b). The trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court that the report does not represent an objective good faith effort to comply with the definition of "expert report." Id. § 74.351(l ).
*277 The purpose of chapter 74's expert report requirement is "to deter frivolous claims, not to dispose of claims regardless of their merits." Scoresby v. Santillan , 346 S.W.3d 546, 554 (Tex. 2011). To constitute a "good faith effort" to comply with the statutory definition of "expert report," the report must provide enough information to fulfill two purposes: (1) the report must inform the defendant of the specific conduct the plaintiff has called into question; and (2) the report must provide a basis for the trial court to conclude that the claims have merit. Id. at 555-56 (citing Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 879 (Tex. 2001) ). The expert report is not required to use any particular words, and it may be informal, "but bare conclusions will not suffice." Id. ; Palacios , 46 S.W.3d at 879 ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill [the] two purposes [of the expert-report requirement]."). "While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can." Columbia Valley Healthcare Sys., L.P. v. Zamarripa , 526 S.W.3d 453, 460 (Tex. 2017) ; Loaisiga v. Cerda , 379 S.W.3d 248, 260 (Tex. 2012) ("A report meets the minimum qualifications for an expert report under the statute 'if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated.' ") (quoting Scoresby , 346 S.W.3d at 557 ).
To avoid dismissal, the plaintiff is not required to "present evidence in the report as if it were actually litigating the merits." Palacios , 46 S.W.3d at 879. The expert report may be informal "in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." Id. In the report, the expert must "explain the basis of his statements to link his conclusions to the facts." Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (quoting Earle v. Ratliff , 998 S.W.2d 882, 890 (Tex. 1999) ); see Van Ness v. ETMC First Physicians , 461 S.W.3d 140, 142 (Tex. 2015) (per curiam) ("An expert must explain, based on facts set out in the report, how and why the breach caused the injury."). The expert report must make a good faith effort to explain how proximate cause will be proven. Zamarripa , 526 S.W.3d at 460. We must view the expert report in its entirety, rather than isolating specific portions of the report, to determine whether the report fulfills the two purposes set out in Palacios . Baty v. Futrell , 543 S.W.3d 689, 694 (Tex. 2018). We look only to the four corners of the expert report to perform this inquiry. Palacios , 46 S.W.3d at 878.
We review a trial court's ruling on a section 74.351 motion to dismiss for an abuse of discretion. Van Ness , 461 S.W.3d at 142 ; Wright , 79 S.W.3d at 52. The trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. Wright , 79 S.W.3d at 52 ; see Van Ness , 461 S.W.3d at 144 (stating that trial court has discretion to review expert report, sort out contents, resolve any inconsistencies in report, and determine whether report demonstrates good faith effort to show claimant's claims have merit). When reviewing a matter committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. Wright , 79 S.W.3d at 52.
B. Analysis
1. Whether Lancaster's wrongful death claim must be dismissed because it is not addressed in the expert report *278 Bay Oaks first argues that because Dr. Davey's expert report does not link Lancaster's pressure ulcers to his death and does not opine on the cause of Lancaster's death, Lancaster has not served an expert report that supports his wrongful death claim. Bay Oaks contends that, regardless of whether Dr. Davey's expert report supports Lancaster's survival cause of action, the wrongful death claim must be dismissed, and the trial court abused its discretion by failing to do so.
In Certified EMS, Inc. v. Potts , the Texas Supreme Court addressed the question of whether an expert report must address every liability theory alleged by the plaintiff in order to be sufficient. 392 S.W.3d 625 (Tex. 2013). Potts alleged that a hospital nurse sexually assaulted her during her hospital stay, and she sued the hospital, the nurse, and the staffing service that referred the nurse to the hospital-Certified EMS. Id. at 626. Potts asserted that Certified EMS was directly liable for the nurse's conduct, and she also alleged that Certified EMS was vicariously liable under the theory of respondeat superior. Id. at 626-27. Certified EMS objected to Potts's expert report and moved to dismiss, arguing that the report did not address the theory of direct liability. Id. at 627. A panel of this Court affirmed the trial court's denial of Certified EMS's motion to dismiss, holding that if a timely expert report adequately addresses at least one liability theory against a health care provider, the suit can proceed, even if the report does not address every liability theory. Id.
The Texas Supreme Court noted that the language of Chapter 74 requires a claimant to file an expert report "[i]n a health care liability claim," but it does not require an expert report to address every liability theory pleaded by the plaintiff. Id. at 630. The court also stated that a valid expert report must summarize the applicable standard of care, explain how a health care provider failed to meet that standard, and establish the causal relationship between the failure and the harm alleged. Id. The court held, "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." Id. The court also noted the dual functions of the expert report as set out in Palacios and held that an expert report "need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue." Id. The court concluded that if the trial court determines that one liability theory is supported by the expert report, the plaintiff's claim is not frivolous and the suit may proceed. Id. at 631 ; see SCC Partners, Inc. v. Ince , 496 S.W.3d 111, 114-15 (Tex. App.-Fort Worth 2016, pet. dism'd) (holding, in same context presented in this case involving survival and wrongful death claims, that if claimant's expert report satisfied section 74.351 's requirements as to either wrongful death claim or survival claim, trial court did not abuse its discretion by denying healthcare providers' motion to dismiss, and entire case could proceed).
We conclude that the reasoning and holding of Certified EMS should be applied to this case involving survival and wrongful death causes of action asserted against a single defendant. As the Texas Supreme Court stated in Certified EMS ,
To require an expert report for each and every theory would entangle the courts and the parties in collateral fights about intricacies of pleadings rather than the merits of a cause of action, creating additional expense and delay as trial and appellate courts parse theories that could be disposed of more simply through other means as the case progresses.
*279 392 S.W.3d at 631. The court also noted that while the expert report "is a threshold mechanism to dispose of claims lacking merit," the report is not the only means for a defendant to challenge "weak subsets" of the claims asserted against it. Id. Through the discovery process, a claimant can "refine [his] pleadings to abandon untenable theories and pursue supported ones," and a defendant may move for summary judgment to dispose of a claim that lacks evidentiary support. Id. at 632. The court stated, "[W]hile a full development of all liability theories may be required for pretrial motions or to convince a judge or jury during trial, there is no such requirement at the expert report stage." Id. ; see Ince , 496 S.W.3d at 115 (reasoning that "[c]arving out causes of action, i.e., alternative 'theories of liability,' at the beginning of the suit before discovery has occurred" would essentially require plaintiffs to meet summary judgment standard of proof at expert-report stage, which Texas Supreme Court has repeatedly rejected).
The court also noted that, in some cases, it may be difficult for a plaintiff to know every viable liability theory within 120 days of filing suit, especially given that Chapter 74 strictly limits discovery until after an expert report is filed. Certified EMS , 392 S.W.3d at 632. Requiring an expert report each time a plaintiff discovers a liability theory would "be impractical," and this requirement would "prohibit altogether those theories asserted more than 120 days after the original petition was filed-effectively eliminating a claimant's ability to add newly discovered theories." Id.
Accordingly, we conclude that if Dr. Davey's amended expert report is sufficient as to Lancaster's survival claim, his case against Bay Oaks may proceed. See ids="7095189" index="39" url="https://cite.case.law/sw3d/392/625/">id. at 631 ; Ince , 496 S.W.3d at 114-15. We therefore turn to the sufficiency of Dr. Davey's amended expert report.
2. Whether the expert report adequately supports Lancaster's survival claim
Bay Oaks argues that Dr. Davey's standard of care opinions are conclusory and speculative concerning the specific conduct of Bay Oaks that is at issue.
Dr. Davey's amended expert report first summarized Lancaster's course of treatment at Bay Oaks beginning in May 2015 and described the progression of the development of Lancaster's pressure ulcers, as reflected in Lancaster's medical records from Bay Oaks and hospital facilities. Dr. Davey then set out in depth what he believed to be the relevant standard of care for long-term nursing facilities as it relates to the development and treatment of pressure ulcers. He began by citing a provision in the Code of Federal Regulations pertinent to Medicare and Medicaid regulations governing long-term care facilities which generally requires a facility to ensure that a resident admitted without pressure ulcers does not develop ulcers unless the resident's clinical condition demonstrates that the ulcers were unavoidable, and, if a resident develops pressure sores, to provide necessary treatment and services to promote healing, prevent infection, and prevent new sores from forming.
Dr. Davey then discussed three more specific standards of care, beginning with ensuring the prevention of avoidable pressure ulcers. Dr. Davey described specific interventions that can prevent pressure ulcers, such as frequently turning the patient, providing the patient with pressure-relieving devices, keeping the patient clean and dry, keeping the patient properly nourished, and administering frequent head-to-toe body examinations to catch skin problems in an early stage. Dr. Davey then set out guidelines from the National *280 Pressure Ulcer Advisory Panel concerning how to prevent pressure ulcers, and described eight things that healthcare providers should address when caring for patients at risk of developing pressure ulcers, including conducting frequent risk assessments, frequent skin assessments, skin care, adequate nutrition, frequent repositioning, and use of special mattresses and support devices such as wheelchair cushions.
Dr. Davey then discussed the standard of care for treating pressure ulcers that have developed, with the goal of promoting healing and preventing infection. He stated that the standard of care requires positioning a patient in a manner that relieves pressure on the ulcer, keeping the patient clean and dry, providing adequate nutrition, cleansing the area of the ulcer when changing dressings, completing regular assessments, and documenting these assessments so the facility can implement the appropriate interventions. Dr. Davey also stated that the standard of care requires nursing facilities to comply with Texas Administrative Code Rule 19.001, which governs staffing of nursing facilities. Dr. Davey stated:
When treating a patient with a high risk of developing pressure ulcers, a facility and its agents must properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight. Such accurate and complete documentation is necessary to properly assess and implement optimal nursing interventions. In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility.
Dr. Davey then described how, in his opinion, Bay Oaks breached the standard of care. He first stated that Bay Oaks breached the standard of care by failing to prevent the formation of new pressure ulcers. When Lancaster was admitted to Bay Oaks in May 2015, he had intact skin on his sacrum and his medical records reflected that the staff determined he was a mild risk for developing pressure ulcers. Dr. Davey opined that, due to his poor health and limited mobility, Lancaster was actually at a high risk for developing pressure ulcers, and the Bay Oaks staff breached the standard of care by failing to implement aggressive interventions-such as frequent repositioning, use of a pressure-relieving mattress, and use of a pressure-relieving device in Lancaster's wheelchair-early in Lancaster's residency to prevent pressure ulcers from developing. Dr. Davey further opined that Bay Oaks staff breached the standard of care by failing to perform consistent skin assessments, failing to perform incontinence care and repositioning every two hours, and failing to measure, describe, and document pressure ulcers as they formed. Dr. Davey stated, "Without proper assessments, development of and changes in the ulcer cannot be communicated to the physician and proper interventions such as those listed above cannot be implemented."
Dr. Davey also opined that Bay Oaks breached the standard of care by allowing Lancaster's pressure ulcers to deteriorate into Stage III and Stage IV ulcers that were infected. Dr. Davey noted that Bay Oaks staff repeatedly failed to document complete assessments of Lancaster's pressure ulcers throughout his residency, omitting details and measurements of the ulcers, "making it impossible to track any deterioration or attempt to adjust the *281 treatments accordingly." Dr. Davey also opined that the medical records reflected that Bay Oaks staff were not turning and repositioning Lancaster every two hours, and although a physician ordered a pressure-relieving mattress in August 2015, the records did not indicate that Lancaster received this special mattress. Dr. Davey stated:
Because the recommended interventions were not performed, Mr. Lancaster's sacral pressure ulcer worsened and did not heal. As a result, the ulcer deteriorated into Stage IV and increased in size substantially and eventually became infected, necessitating aggressive wound care therapy and treatments, multiple surgical debridements, wound VAC placement, and IV antibiotics. This failure to promote the healing of Mr. Lancaster's pressure ulcer and allowing it to deteriorate is a breach in the standard of care.
Finally, Dr. Davey set out his opinions concerning causation, beginning by including general information regarding what pressure ulcers are, how they develop, how breaches in the standard of care can cause pressure ulcers, the various stages of pressure ulcers and how they progress from mild to severe, and how pressure ulcers can impact nursing facility residents. Dr. Davey then opined as follows with regard to Lancaster:
[T]he staff at Bay Oaks failed to implement measures to ensure that Mr. Lancaster did not develop a sacral pressure ulcer and failed to promote the healing of his sacral ulcer once it developed. The staff failed to prevent the worsening of the ulcer, as it increased significantly in size, progressed to Stage IV, ultimately becoming infected and necessitating numerous debridements, wound VAC placement, and IV antibiotic therapy.
The staff also failed to properly assess Mr. Lancaster's skin throughout his residency at Bay [O]aks. While a Stage II sacral pressure [ulcer] was noted on 7/31/2015 by the nursing staff, no detailed assessments were done by any nurses from then until his transfer to the emergency department on 8/29/2015, by which time the ulcer had significantly deteriorated. This means that the staff was not preventing the pressure ulcer and not treating the pressure ulcer early to ensure the best outcome. The nurses' failure to assess, document, and communicate regarding Mr. Lancaster's pressure ulcer prevented the early assessments and treatments necessary to prevent his ulcer from both occurring and worsening.
Furthermore, the staff at Bay Oaks failed to ensure that Mr. Lancaster was properly nourished. Proper nutrition, including adequate protein, vitamin, and carbohydrate intake is vital to tissue healing. Since Mr. Lancaster was not receiving adequate nutrition, he was more vulnerable to skin breakdown. Most significantly, the staff at Bay Oaks failed to turn and reposition Mr. Lancaster frequently enough to offload pressure and provide him with an air mattress. Because the staff did not turn and reposition Mr. Lancaster regularly and provide him with an air mattress, Mr. Lancaster suffered from sustained pressure on his shoulder, ischium, and sacral regions. This sustained pressure caused the blood to stop flowing to these areas. Due to the lack of blood flow, the underlying tissue died which caused Mr. Lancaster to develop multiple pressure ulcers, including a sacral ulcer that eventually deteriorated into an infected Stage IV ulcer during his residency at Bay [O]aks.
....
In my opinion, Mr. Lancaster's severe ulcers were a proximate cause of harm.
*282 Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, and discomfort and difficulties with mobility. As a result of his pressure ulcer, Mr. Lancaster had continued wound treatments that included multiple surgical debridements and wound VAC placement. These invasive treatments are not only uncomfortable, but can be very painful as well. Based on the records, I am also able to opine that Mr. Lancaster's multiple pressure ulcers, including his infected Stage IV sacral pressure ulcer proximately caused him significant pain.
Dr. Davey concluded his amended expert report by stating that, in his expert opinion, the breaches of the standard of care by Bay Oaks' staff "were proximate causes of severe injury and harm to Mr. Lancaster. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have suffered a severe and infected sacral pressure ulcer."
We conclude that the amended expert report in this case satisfies the two purposes set out in Palacios : the report informs Bay Oaks of the specific conduct that Lancaster has called into question, and it provides a basis for the trial court to conclude that Lancaster's claim has merit. See Scoresby , 346 S.W.3d at 556. Dr. Davey did not merely state his bare conclusions regarding the standard of care, breach, and causation, but he instead "explain[ed] the basis of his statements to link his conclusions to the facts." See Wright , 79 S.W.3d at 52. Dr. Davey explained "based on facts set out in the report, how and why the breach caused the injury." See Van Ness , 461 S.W.3d at 142 ; see also Ince , 496 S.W.3d at 118 (holding expert report sufficient as to causation when report explained how pressure ulcers form, noted that medical records did not indicate that facility followed pressure-ulcer prevention program and that pressure ulcer was immediately found when patient was transferred to hospital, and stated that failure to monitor and identify fixable ulcers resulted in patient's greater pain and suffering); Select Specialty Hosp.-Houston Ltd. P'ship v. Simmons , No. 01-12-00658-CV, 2013 WL 3877696, at *10-11 (Tex. App.-Houston [1st Dist.] July 25, 2013, no pet.) (mem. op.) (holding that expert reports that set out specific treatments facility should have followed, but did not follow, to prevent and treat patient's skin wounds were sufficient); San Jacinto Methodist Hosp. v. Bennett , 256 S.W.3d 806, 816-17 (Tex. App.-Houston [14th Dist.] 2008, no pet.) (holding expert report that linked hospital's failure to provide adequate skin assessments, hydration, nutrition, and specific interventions to formation and worsening of pressure ulcers was sufficient); Gallardo v. Ugarte , 145 S.W.3d 272, 279-80 (Tex. App.-El Paso 2004, pet. denied) (holding expert report was sufficient when report set out steps standard of care required to prevent pressure ulcers, stated how standard of care was breached by not taking steps, and concluding that if proper steps had been taken, pressure ulcer could have been prevented or could have been prevented from progressing to Stage IV).
On appeal, Bay Oaks argues that Dr. Davey improperly imposed a "strict liability" standard of care by failing to analyze whether Lancaster's pressure ulcers were unavoidable, given his poor health at the time he was admitted to Bay Oaks, and by reasoning that because Lancaster developed pressure ulcers while at Bay Oaks, a breach of the standard of care must have occurred. This argument oversimplifies Dr. Davey's expert report, in which he opined not just that Bay Oaks breached the standard of care by allowing pressure ulcers to *283 develop, but that Bay Oaks also breached the standard of care by not timely intervening and thus allowing the pressure ulcers to worsen into an infected state. Dr. Davey also opined that Bay Oaks staff improperly determined, upon Lancaster's admission to the facility, that he was only at a "mild" risk for developing pressure ulcers, when Dr. Davey believed that due to his poor health and limited mobility, Lancaster was at a high risk of developing ulcers and Bay Oaks therefore should have implemented interventions such as frequent repositioning and use of pressure-relieving devices early in Lancaster's residency in an attempt to prevent, or slow, the development of pressure ulcers. Dr. Davey thus identified specific actions that the standard of care required Bay Oaks to take, but did not take, which led to the development and worsening of Lancaster's pressure ulcers. Cf. Palacios , 46 S.W.3d at 879-80 (holding that expert's statement that patient "had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized" was conclusory concerning standard of care because trial court and defendant could not determine if expert believed standard of care required defendant "to have monitored Palacios more closely, restrained him more securely, or done something else entirely").
Bay Oaks also argues that Dr. Davey improperly assumed and speculated that Bay Oaks did not provide specific interventions such as repositioning, which Dr. Davey "concede[d]" that he did not know if Bay Oaks staff performed this, and using a pressure-relieving mattress, although the medical records indicated that a physician ordered such a mattress. Dr. Davey acknowledged that the medical records indicated that a physician ordered an air mattress for Lancaster in late August 2015, although, in his opinion, this should have been done earlier in Lancaster's residency to prevent the formation of pressure ulcers, instead of done after Lancaster had already developed pressure ulcers that were worsening. Dr. Davey also acknowledged that the medical records were not clear about whether Bay Oaks staff turned and repositioned Lancaster every two hours, but he also opined that Bay Oaks' record-keeping with regard to the interventions implemented, the assessments performed, and the details and measurements of the various pressure ulcers was inconsistent at best and absent at worst and that this itself was a breach of the standard of care, as it made it impossible for staff to track the progression of Lancaster's pressure ulcers and determine appropriate care and interventions going forward.
To the extent that Bay Oaks argues that the amended expert report is insufficient because Dr. Davey is incorrect in his conclusions about what the standard of care requires, what constitutes a breach of the standard of care, and how the alleged breaches caused harm to Lancaster, we note that whether an expert's opinions are correct "is an issue for summary judgment, not a motion to dismiss under chapter 74." See Methodist Hosp. v. Shepherd-Sherman , 296 S.W.3d 193, 199 n.2 (Tex. App.-Houston [14th Dist.] 2009, no pet.) ; see also Hillery v. Kyle , 371 S.W.3d 482, 492 (Tex. App.-Houston [1st Dist.] no pet.) (citing Shepherd-Sherman and concluding that expert was not required to rule out all possible causes of death at expert-report stage). The issue in this appeal is whether Dr. Davey's conclusions regarding standard of care, breach of that standard, and causation are conclusory and conjectural; the possibility that facts may later be discovered that prove Dr. Davey's conclusions incorrect is not a basis for holding that Dr. Davey's amended expert report is insufficient under section 74.351.
*284 See Fagadau v. Wenkstern , 311 S.W.3d 132, 139 (Tex. App.-Dallas 2010, no pet.) (stating that fact that plaintiff may not be able to prove causation at trial does not render expert report inadequate).
In this case, the trial court reasonably could have concluded that Dr. Davey's amended expert report addressing Lancaster's survival claim represented an objective good-faith effort to comply with the statutory requirements of an expert report. See TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l ), (r)(6) ; Scoresby , 346 S.W.3d at 556. We therefore hold that the trial court did not abuse its discretion in denying Bay Oaks' motion to dismiss.
We overrule Bay Oaks' first and second issues.
Conclusion
We affirm the order of the trial court.

Dr. Davey also opined that Bay Oaks breached the standard of care as set out in the Texas Administrative Code's staffing requirements for nursing facilities because "it [was] clear that there were not enough staff members to turn and reposition Mr. Lancaster as frequently as he needed it."