

# NUMBER 13-18-00382-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

COLUMBIA VALLEY HEALTHCARE
SYSTEM, L.P. A/K/A VALLEY REGIONAL
MEDICAL CENTER,                                                    Appellant,

v.

ELISEO GUERRERO, INDIVIDUALLY
AND ON BEHALF OF THE ESTATE
OF HILDA GUERRERO, DECEASED,                                       Appellee.

---

### On appeal from the 404th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Hinojosa

Appellant Columbia Valley Healthcare System, L.P. a/k/a Valley Regional Medical

Center (VRMC) appeals the trial court's order denying its motion to dismiss a healthcare

liability claim brought by appellee Eliseo Guerrero, individually and on behalf of the Estate of Hilda Guerrero, deceased (Guerrero). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9). In four issues, which we treat as one, VRMC argues that the trial court erred in denying its motion to dismiss because Guerrero failed to serve a compliant expert report as required by the Texas Medical Liability Act (TMLA). *See id*. § 74.351. We affirm.

## I.    BACKGROUND[1]

On March 4, 2015, Guerrero presented to the VRMC emergency room complaining of chest tightness, cough, fever, sinus trouble, and a headache. Christian Ellis, M.D diagnosed Guerrero with acute coronary syndrome[2] and ordered that she receive a therapeutic dose of enoxaparin, an anticoagulant type of blood thinner. On March 5, Dr. Ellis updated his diagnostic impression to hypertensive emergency[3] without acute coronary syndrome. Dr. Ellis indicated in his progress note on that day that he intended to lower Guerrero's enoxaparin dose to a prophylactic level. However, Dr. Ellis did not create a separate physician's order to change the dosing at that time, and Guerrero continued to receive a therapeutic dose of enoxaparin for the next two days. On March 6, Dr. Ellis noted constipation and abdominal discomfort and planned to pursue an abdominal CT scan and brain MRI. On March 7, Dr. Ellis noted that Guerrero's blood

---

[1] We derive the factual background from the pleadings and expert reports. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 456 n.5 (Tex. 2017).

[2] "Acute coronary syndrome is a term used to describe a range of conditions associated with sudden, reduced blood flow to the heart." *Acute Coronary Syndrome*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/acute-coronary-syndrome/symptoms-causes/syc-20352136 (last visited Nov. 3, 2020).

[3] "A hypertensive crisis is a severe increase in blood pressure that can lead to a stroke." Sheldon G. Sheps, M.D., *Hypertensive Crisis,* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/expert-answers/hypertensive-crisis/faq-20058491 (last visited Nov. 3, 2020).

pressure was mildly low. He detected a small hematoma in the left abdominal wall and a "hematoma of the left rectus abdominis muscle." On this day, the administration of enoxaparin was discontinued.

On March 8, Guerrero developed an acute and severe hemorrhage. She was transferred to the intensive care unit (ICU) where she received repeated blood transfusions, intubation with mechanical ventilation, renal replacement therapy, and broad-spectrum antibiotics. Guerrero remained hospitalized until her death on March 24, 2015.

Guerrero sued Dr. Ellis[4] and VRMC alleging health care liability claims. With respect to VRMC, Guerrero alleged that its nursing staff was negligent in failing to: (1) properly evaluate Guerrero; (2) properly interpret diagnostic data pertaining to Guerrero's condition; (3) "recognize the signs and symptoms of hematoma, renal failure and life-threatening bleed"; (4) "properly and timely report vital clinical and laboratory results to the physician"; and (5) discontinue "administration of therapeutic anti-coagulant medication following the physician's orders to decrease and/or discontinue the medication[.]" Guerrero alleged that the continued administration of the anticoagulant at a therapeutic dose resulted in "multiple hematoma suffered by [Guerrero] caus[ing] her to lose more than half of her blood volume during her hospitalization, . . . hemorrhagic shock and her ultimate death."

Guerrero timely served the expert report of Timothy Niessen, M.D., pursuant to § 74.351 of the Texas Civil Practice and Remedies Code. *See id*. VRMC filed objections

---

[4] Dr. Ellis is not a party to this appeal.

3

to the report, and the trial court entered an agreed order granting Guerrero thirty days to cure the alleged deficiencies in the report. *See id*. § 74.351(c). Within the thirty-day window, Guerrero served two amended expert reports by Dr. Niessen.

In his most recent report, Dr. Niessen expressed the following opinions:

- The standard of care for a hospital like VRMC requires clear communication of orders between the physicians and hospital departments. As a result of the lack of communication, orders for therapeutic enoxaparin were not discontinued despite a change in dosage being expressed in the progress notes. To the extent that VRMC maintains a medical records system that does not require separate physician orders, this is a deviation of the standard of care.

- The standard of care for Dr. Ellis required that he enter a separate medication order. Dr. Ellis deviated from this standard of care by not entering a separate physician's order to discontinue therapeutic enoxaparin and replace it with prophylactic dosing.

- The standard of care requires nurses to monitor the patient's chart for orders and continued care, specifically regarding the administration of high-risk medications such as anticoagulants. The nurses deviated from the standard of care by ignoring the plan of care set forth by Dr. Ellis in the March 5 progress notes.

- The standard of care for the nursing staff requires that the documented plan of care correspond to the executed plan of care. The nursing staff breached the standard of care by continuing to administer life-threatening anticoagulants to Guerrero for two days contrary to the documented plan of care and when not indicated by her presentation. This increased dosage resulted in severe bleeding, hypotension,[5] and ultimately Guerrero's death.

- The standard of care for physicians managing patients with hypertensive emergency requires that the patient be transferred to an intermediate care unit (IMC) or ICU for the frequent assessment of vital signs and response to therapy. VRMC and Dr. Ellis deviated from the standard of care by admitting Guerrero to a general ward with inadequate monitoring of hemodynamic and laboratory parameters.

---

[5] Hypotension, or low blood pressure, is indicated by "[a] blood pressure reading lower than 90 millimeters of mercury (mm Hg) for the top number (systolic) or 60 mm Hg for the bottom number (diastolic)[.]" *Low Blood Pressure (Hypotension)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/low-blood-pressure/symptoms-causes/syc-20355465 (last visited Nov. 3, 2020).

- The standard of care for the nursing staff provides the nurses with an independent duty to see that patients are receiving the appropriate level of care to ensure the adequate monitoring of hemodynamic and laboratory parameters. VRMC nurses deviated from the standard of care by not initiating the proper chain of command to address the inadequate level of care and by not monitoring Guerrero at time intervals appropriate to her required level of care. Closer monitoring would have, based upon reasonable medical probability, allowed Guerrero's condition to be appropriately treated and she more than likely would have survived the initial negligent treatment.

- In a patient who presented with severely elevated blood pressure, the standard of care requires the nursing staff to communicate changes in patient condition to the physicians, including Guerrero's development of new relative and absolute hypotension, or low blood pressure. The available medical records do not contain such communication. The nursing staff's failure to communicate life threatening perturbations in vital signs to Dr. Ellis in a timely manner is a deviation of the nursing standard of care.

- Administering a therapeutic dose of anticoagulants without medical necessity is a breach of the standard of care by Dr. Ellis and the nursing staff at VRMC.

- Unintended but continued therapeutic administration of anticoagulants and the subsequent delay in recognition and treatment of hemorrhaging directly contributed to Guerrero's death and represent deviations from the standard of care by Dr. Ellis and by the nursing staff.

- Due to the risks of bleeding, therapeutic anticoagulation is only appropriate for patients with a compelling indication. Guerrero did not require therapeutic anticoagulant therapy; therefore, the continued administration of the medication by the VRMC nursing staff resulted in severe bleeding.

- The risk of bleeding, including life-threatening hemorrhage, with therapeutic anticoagulation is increased in patients with severe uncontrolled hypertension. Once the diagnostic impression evolved from acute coronary syndrome to hypertensive emergency without acute coronary, therapeutic enoxaparin should have been stopped. Dr. Ellis documented his intention to reduce the dose in his progress notes. However, the plan was not carried out by either the nursing, pharmacy or physician staff. This error was not recognized until Guerrero suffered life-threatening bleeding, which reflects a breakdown of communication between the physician, pharmacist and nursing staff and a deviation from the standard of care for both Dr. Ellis and VRMC.

5

- Because anticoagulants increase the risk of bleeding, close monitoring of patients treated with anticoagulant therapy is necessary. Inadequate monitoring of therapeutic anticoagulation by VRMC and Dr. Ellis led to a delay in the recognition and management of acute and severe hemorrhaging associated with hypotension, tissue ischemia, and end-organ dysfunction.

VRMC filed objections to Dr. Niessen's report and a motion to dismiss Guerrero's claims pursuant to § 74.351(b) of the TMLA. *Id*. § 74.351(b). VRMC argued that the expert report was "insufficient to show [VRMC] or its nurses breached any standard of care applicable to it or that any such breach proximately caused [Guerrero's] injury or death." *See id*. § 74.351(r)(6). VRMC also argued that there were analytical gaps in Dr. Niessen's causation analysis.

Following a hearing, the trial court signed an order denying VRMC's motion to dismiss. This interlocutory appeal followed. *See id*. § 51.014(a)(9).

## II.    STANDARD OF REVIEW & APPLICABLE LAW

Chapter 74 of the Texas Civil Practice and Remedies Code requires a plaintiff bringing a healthcare liability suit against a health care provider to timely file and serve an expert report providing:

> [A] fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id*. § 74.351(r)(6); *see Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011).

Should a defendant health care provider file a motion challenging the adequacy of an otherwise timely report, "the court may grant the motion 'only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply

6

with the [TMLA's] definition of an expert report.'" *Baty v. Futrell*, 543 S.W.3d 689, 692–93 (Tex. 2018) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l)). To constitute a good faith effort, the report must (1) inform the defendant of the specific conduct forming the basis of the claim and (2) provide an evidentiary foundation for the trial court to conclude that the claim has legal merit. *Baty*, 543 S.W.3d at 693–94; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

A report meets the minimum requirements under the statute if it provides an explanation of "how and why" the defendant's alleged conduct is factually implicated in the injury in question; "i.e., but for the act or omission—the harm would not have occurred." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)). "While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can." *Zamarripa*, 526 S.W.3d at 460. "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556; *see Zamarripa*, 526 S.W.3d at 460. Courts review the sufficiency of the expert report by looking within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)).

An appellate court reviews the trial court's ruling on the adequacy of an expert report and denial of a motion to dismiss for an abuse of discretion. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017). A trial court abuses its discretion when it makes a decision without using guiding rules or principles. *Id*. at 512–

## III.    DISCUSSION

VRMC argues that Dr. Niessen's expert report is inadequate because it fails to: (1) set forth a specific standard of care applicable to VRMC; (2) demonstrate factually that VRMC breached any applicable standard of care; and (3) demonstrate that VRMC proximately caused any harm to Guerrero. VRMC also argues that Guerrero should not have been permitted to file two amended expert reports within the thirty-day window allowed for curing deficiencies.

## A.    Amended Expert Report

We first address VRMC's contention that this Court should disregard the second amended expert report of Dr. Niessen. VRMC argues that a plaintiff is permitted to amend its expert report only once when granted a thirty-day extension to cure a deficient report.

"In construing a statute, our objective is to determine and give effect to the Legislature's intent." *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008) (citing *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000)). We first look to the statute's language, because the words the Legislature chooses is the surest guide to legislative intent. *Id*. If the statute's language is unambiguous, its plain meaning will prevail. *Id*. (citing *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003)).

The TMLA provides, "If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). VRMC contends that the statute's reference to "one

30-day extension" should be construed as permitting the filing of only one amended report during the thirty-day time period. We disagree.

Section 74.351(c) plainly limits the *time* in which a plaintiff may cure a deficient expert report, but it places no limitation on the *number* of expert reports that may be served within that time. At any rate, Guerrero served the first amended report before the thirty-day extension was granted. After the extension, Guerrero served only one additional amended report. The Texas Supreme Court has previously held that § 74.351 permits a plaintiff to file multiple reports before a trial court has ruled on a defendant's motion to dismiss without forfeiting the right to obtain an additional thirty-day extension to cure any deficiencies. *See Leland*, 257 S.W.3d at 208. Therefore, even if we were to accept VRMC's argument, Guerrero did not forfeit her right to serve an additional amended report by having previously done so before the extension was granted. For the foregoing reasons, we conclude that the second amended report was properly served. Therefore, the trial court did not err in considering the report.

**B.      Standard of Care & Breach**

Next, VRMC argues that the trial court abused its discretion in denying VRMC's motion to dismiss because "Dr. Niessen fails to set forth a specific standard of care applicable to [VRMC and its nursing staff.]" VRMC asserts that Dr. Niessen "uses ambiguous language to suggest a physician's standard of care applies to [VRMC] and its nursing staff." It argues that such a standard would require the hospital to engage in the unlawful practice of medicine. VRMC further argues that Dr. Niessen's expert report fails to demonstrate that VRMC breached "any applicable, lawful standard of care[.]"

9

The applicable standard of care is defined by what an ordinarily prudent health care provider would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 747 (Tex. App.— Houston [14th Dist.] 2011, no pet.). To adequately identify the standard of care and breach thereof, an expert report must set forth "specific information about what the defendant should have done differently." *Abshire*, 563 S.W.3d at 226 (citing *Palacios*, 46 S.W.3d at 880). While the TMLA requires only a "fair summary" of the standard of care and how it was breached, the report must set out what care was expected but not given. *Id*. An expert's articulated standard of care for nurses cannot require the practice of medicine because nurses are prohibited from doing so under Texas law. *See* TEX. OCC. CODE ANN. §§ 155.001–.003 (providing that no person may "practice medicine" without a medical license); *id*. § 151.002(a)(13) ("'[p]racticing medicine' means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder . . . or injury. . . ."); *id*. § 301.002(2), (4)–(5) (barring nurses from "acts of medical diagnosis or the prescription of therapeutic or corrective measures"); *Zamarripa*, 526 S.W.3d at 461 n.36.

Dr. Niessen opined that the standard of care required the nursing staff to: (1) communicate changes in a patient's condition to the physicians; (2) monitor the patient's chart for orders and continued care, specifically regarding the administration of high-risk medications such as anticoagulants; (3) ensure that the plan of care corresponded with the plan documented by the physician; (4) initiate chain of command if they believed a patient was not receiving the appropriate level of care; and for VRMC, in particular, to (5) provide for the clear communication of orders between the physicians and hospital

departments.

We disagree that the articulated standard of care impermissibly required VRMC or its nurses to practice medicine. In other words, Dr. Niessen did not propose a standard of care that required the nursing staff to diagnose or treat a mental or physical disease or disorder. *See* TEX. OCC. CODE ANN. § 151.002(a)(13); *see also Columbia Med. Ctr. of Arlington v. Shelby*, No. 05-17-01358-CV, 2018 WL 6187437, at *8 (Tex. App.—Dallas Nov. 27, 2018, no pet.) (mem. op.) (concluding that nurses' alleged failure to notify doctors of symptoms they observed or to initiate the chain of command did not require the nurses to diagnose the patient's condition or to practice medicine). Texas courts have found that similar articulations by experts constitute a proper, lawful, standard of care for nurses. *See Renaissance Healthcare Sys. v. Swan*, 343 S.W.3d 571, 586 (Tex. App.—Beaumont 2011, no pet.) (mem. op.) (concluding that an expert report sufficiently articulated a standard of care which required nursing personnel to recognize the signs of hemorrhage, summon a physician to patient's bedside, and institute the chain of command); *Tenet Hosps. v. Barnes*, 329 S.W.3d 537, 542–43 (Tex. App.—El Paso 2010, no pet.) (concluding that the expert reports of a doctor and a nurse adequately articulated the standard of care which required nurse to notify the physician of a significant change in the patient's blood pressure following angiogram); *see also Columbia Plaza Med. Ctr. of Fort Worth v. Jimenez*, No. 02-15-00275-CV, 2016 WL 2586738, at *4–5 (Tex. App.— Fort Worth May 5, 2016, no pet.) (mem. op.) (concluding that the expert report properly articulated the standard of care for hospital staff which required that they observe, monitor, and recognize symptoms or conditions).

Further, Dr. Niessen identified the following specific breaches of the standard of care by VRMC and its nursing staff: (1) failing to communicate life threatening perturbations in vital signs such as hypotension to Dr. Ellis in a timely manner; (2) ignoring the plan of care set forth by Dr. Ellis in the March 5 progress notes; (3) continuing to administer life-threatening anticoagulants to Guerrero for two days contrary to the documented plan of care; (4) failing to initiate the proper chain of command to address the inadequate level of care; and (5) failing to maintain a proper medical record system for the communication of physician orders.

With respect to the nurses' purported failure to communicate changes in vital signs, Dr. Niessen properly inferred such a breach from the lack of documentation in the medical records. *See Bay Oaks SNF, LLC v. Lancaster*, 555 S.W.3d 268, 273–74, 280–84 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) (affirming trial court's approval of expert report that relied in part on lack of documentation of required care to prevent pressure ulcers); *see also Hood v. Kutcher*, No. 01-12-00363-CV, 2012 WL 4465357, at *4 (Tex. App.—Houston [1st Dist.] Sept. 27, 2012, no pet.) (mem. op.) (holding that an expert could infer from lack of documentation in medical records that thorough wound cleaning did not occur and breached standard of care). Further, Dr. Niessen was not required to identify with exacting precision the acts or omissions by which VRMC's staff deviated from the standard of care. *See Palacios*, 46 S.W.3d at 879 (explaining that "a plaintiff need not present evidence in the report as if it were actually litigating the merits"). Such detail is simply not required at this stage of the proceedings. *Abshire*, 563 S.W.3d at 227. Dr. Niessen identified the specific actions that should have been taken by VRMC and its staff

12

but were not. *See id*. at 226. In that regard, his report is neither conclusory nor speculative. Accordingly, we conclude that Dr. Niessen's expert report provides a fair summary of the standard of care and how it was breached. *See id*; *Tenet Hosps. v. De La Rosa*, 496 S.W.3d 165, 172 (Tex. App.—El Paso 2016, no pet.); *Barnes*, 329 S.W.3d at 542–43.

## C.     Causation

Next, VRMC argues that Dr. Niessen failed to demonstrate that VRMC "proximately caused any harm to [Guerrero]." The causation requirement requires that the expert explain "how and why" the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id*.; *see also Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the ipse dixit of the experts, which . . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Zamarripa*, 526 S.W.3d at 460.

In *Abshire,* the Texas Supreme Court reviewed whether an expert report sufficiently demonstrated causation with respect to the nursing staff's purported failure to recognize and document a patient's osteogenesis imperfect (OI), also known as brittle bone disease and to recognize the symptoms of a spinal compression fracture. 563 S.W.3d at 224–26. The patient's expert opined that the failure of the nursing staff to

13

document a complete and accurate assessment resulted in a delay in proper medical care that would have included the ordering of imaging studies and protection of the spine. *Id*. at 224. The expert explained that the nursing staff should have linked the patient's symptoms to her OI diagnosis, which would have resulted in the patient's admission to the hospital on absolute bed rest and the receipt of treatment to preserve the integrity of the spine. *Id*. According to the expert, these failures lead to the exacerbation of an undiagnosed vertebral facture which resulted in paralysis. *Id*. at 225.

The supreme court concluded that the expert's "explanation provides a straightforward link between the nurses' alleged breach of the standard of care and [the patient's] spinal injury." It explained that "the report draws a line directly from the nurses' failure to properly document [the patient's] OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)." *Id*. Accordingly, the court held that the report provided a fair summary of the causal relationship between the defendant's breach and the patient's injury. *Id*. at 226.

Here, Dr. Niessen's report similarly provides a straightforward link between the nurses' alleged breach of the standard of care and Guerrero's life-threatening injuries. Dr. Niessen draws a direct line from the nurses' deviations from the standard of care to the prolonged administration of therapeutic enoxaparin, which, according to Dr. Niessen, led to Guerrero's hemorrhaging and ultimate death. *See id*. As such, we conclude that the report provides a fair summary of the causal relationship between VRMC's breach of the standard of care and Guerrero's death. *See id*.

**D.     Summary**

We conclude that Dr. Niessen's report qualifies as a "good-faith" effort to comply with the requirements of § 74.351. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *see also Abshire,* 563 S.W.3d at 224. Therefore, we hold the trial court did not abuse its discretion in denying VRMC's motion to dismiss. As reframed, we overrule VRMC's sole issue.

**IV.     Conclusion**

We affirm the trial court's order.

LETICIA HINOJOSA
Justice

Delivered and filed the
19th day of November, 2020.

15